***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as facts and concludes as a matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff and defendant-employer.
3. The carrier on the risk is American Home Assurance, with CMI as the third-party administrator.
4. Plaintiff's average weekly wage was to be determined from an I.C. Form 22 Wage Chart to be provided by defendants with supporting wage information. However, the Form 22 Wage Chart was never submitted.
5. Plaintiff sustained an injury to her spine, including her low back and neck, and right shoulder on January 5, 2004. Defendants accepted the claim by filing a Form 60 on July 28, 2004.
6. The parties submitted the following stipulated exhibits, which were admitted into evidence at the Deputy Commissioner's hearing:
 a. Stipulated Exhibit 1 — Pre-Trial Agreement,
 b. Stipulated Exhibit 2 — Industrial Commission forms, and
 c. Stipulated Exhibit 3 — Medical records.
7. The issues before the Commission are whether plaintiff's psychological condition is causally related to her compensable injury by accident of January 5, 2004, and, if so, what bills for psychological treatment and prescriptions should be paid as part of the workers' compensation claim; if plaintiff's psychological treatment is related to her injury by accident, is the same currently disabling; and whether the medications and treatment prescribed by Dr. James Forstner and/or Dr. Adam Brown, unauthorized providers, should be approved. *Page 3 
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 52 years old. Plaintiff used a walker at the hearing. Plaintiff was employed by defendant-employer for a period of five years at the time of her compensable injury by accident on January 5, 2004.
2. Plaintiff started her career with defendant-employer Wal-Mart as a stocker. She later became a Customer Service Manager (CSM) and was responsible for the front cash register operators. She worked in this position before requesting a transfer to the night shift in order to care for her mother during the day, after her mother had a stroke. Plaintiff was re-assigned as a stocker, which allowed her to work nights.
3. On January 5, 2004, plaintiff and co-worker Karen Kirkman were stocking shelves at the Southport, North Carolina store. Plaintiff was standing on a V-shaped stepladder when it collapsed. Plaintiff fell, becoming entangled in the ladder, which caused her to hang upside down. Plaintiff's legs were pinched and in the fall she banged her head and spine on the shelving. Her shirt fell over her face exposing her abdomen and breasts to her co-workers. Plaintiff attempted to use her left hand to try to tuck her shirt back into her pants but she was unsuccessful. She hung upside down entangled in the ladder for about 45 minutes, during which time she felt embarrassed and humiliated in terms of the way her situation was handled by co-workers. Defendant-employer's employees could not disentangle plaintiff from the ladder and emergency workers had to free her. *Page 4 
4. Plaintiff was transported by ambulance to the Dosher Memorial Hospital Emergency Room in Southport where she was diagnosed with multiple soft tissue neck and back strain injuries. X-rays of her lumbar spine, right hip, chest, right ankle, thoracic spine, and cervical spine were all negative for any fractures or abnormalities.
5. Defendants accepted plaintiff's claim as compensable and began providing medical care and weekly temporary total disability payments in the amount of $283.54.
6. Plaintiff began treatment with general practitioner Dr. Peter Almirall, who diagnosed a cervical strain and multiple contusions with right-sided body pain from the fall. Dr. Almirall referred plaintiff for an orthopedic evaluation.
7. On March 2, 2004, plaintiff began treating with Dr. R. Mark Rodger at Atlantic Orthopedics for injuries to her right thigh, right shoulder, and lumbar spine. Upon his examination, Dr. Rodger found positive Waddell signs and noted, "I believe this lady seems much more disabled than she should be based on the mechanism and soft tissue contusion, which is now a month old." Dr. Rodger ordered a cervical MRI, which showed no surgical pathology. On April 27, 2004, Dr. Rodger referred plaintiff to a physiatrist and released her to sedentary-level work.
8. Based on Dr. Rodger's referral, on June 1, 2004, plaintiff came under the care of physiatrist Dr. Angela Thomas at Physical Medicine and Rehabilitation in Wilmington (now Coastal Rehabilitation Medicine). Dr. Thomas made a diagnosis of neck and back pain consistent with a cervical strain, with newer complaints of increasing low back pain and diffuse myofascial pain and numbness. Dr. Thomas ordered physical therapy and told plaintiff to gradually discontinue use of her non-prescription cervical collar. *Page 5 
9. On August 30, 2004, plaintiff returned to Dr. Thomas and reported that she had cancelled her recent July appointment because she was treating with her own primary care physician, Dr. James Forstner, who was prescribing Lorcet and Xanax. Plaintiff told Dr. Thomas that Dr. Forstner had been treating her for years with Lorcet for chronic low back pain. Because Dr. Thomas was uncomfortable with plaintiff being treated by two physicians for the same problem, she and plaintiff entered into a pain management agreement that Dr. Thomas would be her sole pain management physician. Dr. Thomas planned for plaintiff to exhaust her existing supply of Lorcet from Dr. Forstner and then discontinue this narcotic medication over the next several visits.
10. On October 12, 2004, plaintiff returned to Dr. Thomas and reported that she wanted to continue to receive Lorcet prescriptions from Dr. Forstner because of his long-term treatment of plaintiff. Thereafter, Dr. Thomas did not provide any opioid pain management for plaintiff.
11. On October 25, 2004, Dr. Thomas saw plaintiff one final time prior to Dr. Thomas' relocation from Wilmington. Dr. Thomas recommended a cervical and lumbar CT myelogram but noted that if the CT myelogram failed "to reveal any significant spine pathology, then I think she is at the point of considering a functional capacity examination to be released with regards to her neck and lower back." Dr. Thomas also recommended a right shoulder MRI and made an orthopedic referral for further shoulder treatment.
12. Secondary to Dr. Thomas' departure from the area and her recommendation for an orthopedic evaluation for plaintiff's right shoulder, on January 28, 2005, plaintiff returned to Dr. Rodger. Dr. Rodger considered Dr. Thomas' October 25, 2004, imaging orders, but elected *Page 6 
to order a repeat cervical MRI and a right shoulder MRI. Dr. Rodger noted that if these tests were negative for surgical pathology, he would rate and release plaintiff.
13. On March 3, 2005, plaintiff underwent the right shoulder and cervical MRIs. On April 27, 2005, Dr. Rodger noted that the cervical MRI showed some degenerative changes but no herniation, no nerve compression, and no surgical lesion. Dr. Rodger referred plaintiff back to Coastal Rehabilitation Medicine for any further neck treatment. Dr. Rodger noted that the right shoulder MRI showed some abnormalities and therefore referred plaintiff to Atlantic Orthopedics' shoulder specialist, Dr. Richard Bahner, to examine the right shoulder.
14. Dr. Bahner saw plaintiff on May 23, 2005. Plaintiff presented for her examination in a robe and pajamas, which she reported to Dr. Bahner she had been wearing since her injury because it was too hard for her to get dressed and she had no reason to get dressed. Plaintiff was emotional and had "great reactions to attempted simple commands." Dr. Bahner noted that the right shoulder MRI revealed tendinopathy with minor arthropathy in the AC joint and mild subacromial bursitis, but no true tear or retractions. Dr. Bahner did not recommend surgery and had "no opinion" on plaintiff's work status.
15. On May 3, 2005, plaintiff sought unauthorized treatment at Coastal Neurosurgical Associates and Spine Center. She had been treated there in 1999 by Dr. Adam P. Brown, who performed a lumbar discectomy at L5-S1. Plaintiff complained of low back pain, lower bilateral extremity pain and numbness, and pain all over. PA-C Christopher Steyskal set her up for a myelogram and post-myelogram CT scan, which were done on May 24, 2005.
16. Plaintiff returned to Coastal Neurosurgical on June 21, 2005, at which time the negative test results were reviewed by the physician's assistant and by Dr. Brown who referred *Page 7 
plaintiff to the Center for Pain Management. Plaintiff was diagnosed with chronic back and leg pain.
17. Dr. Brown treated plaintiff on September 5, 2006, at which time plaintiff was wearing a soft neck collar, although she made no complaints about her neck. She reported severe pain and screamed when Dr. Brown raised her legs more than about twenty degrees. At the last visit on October 3, 2006, Dr. Brown noted that plaintiff was difficult to examine. As he testified, Dr. Brown found very little on objective studies to verify plaintiff's pain complaints and concluded that there must be a psychological component.
18. With regard to her pain medicines, plaintiff was non-compliant with Dr. Thomas, her authorized treating physician, and made a conscious decision to receive opioid pain medicines from her personal, non-authorized physician, Dr. Forstner. Plaintiff was in no medical emergency that required immediate treatment by Dr. Forstner or Dr. Brown, and the treatment being provided by plaintiff's authorized treating physicians was not late or inadequate so as to cause the need for the concurrent treatment with Dr. Forstner and Dr. Brown.
19. On June 23, 2005, plaintiff returned to Dr. Thomas' prior practice, Coastal Rehabilitation Medicine, where she came under the care of Dr. John Ligouri for her spinal pain complaints. At this time most of plaintiff's pain complaints were in her left sacroiliac joint region. Dr. Ligouri ordered outpatient physical therapy for sacroiliitis and SI joint injections.
20. On July 12, 2005, plaintiff returned to Dr. Bahner for a recheck of her right shoulder pain. He noted that, "Today she grimaces, moans and makes noise with any attempt at physical examination. She limits her range of motion of her neck voluntarily. She limits the range of motion of her shoulder voluntarily." Dr. Bahner further noted, "I discussed with the patient it is unlikely that I will be able to help her with this problem at all. Due to the time frame *Page 8 
that she has had this problem as well as the coexisting psychosocial problems and the emotional state, I would recommend she seek another opinion regarding this. I have reinforced to her that I currently do not have anything to offer her."
21. On September 8, 2005, plaintiff returned to Dr. Ligouri, who testified that, "She told me — the story changed, and she went from the physical therapy helped her, and now — now it was not only not helping her, it was making her worse." As of September 8, 2005, Dr. Ligouri was under the impression that plaintiff was either malingering or magnifying her symptoms, all for secondary gain. Dr. Ligouri further noted on September 8, 2005, that he had nothing more to offer plaintiff and discharged her from his care.
22. On December 30, 2005, plaintiff returned to Dr. Bahner for the last time regarding her right shoulder pain complaints. She again was wearing pajamas. Due to plaintiff's self-limiting behavior, Dr. Bahner could not adequately assess plaintiff or put restrictions on her.
23. On October 19, 2007, plaintiff returned to Dr. Ligouri at Coastal Rehabilitation Medicine for the final time. Plaintiff was wearing pajamas, with a soft cervical collar and right wrist splint, and was using a walker. Dr. Ligouri found many inconsistencies in plaintiff's physical examination which were "red flags" causing him to doubt plaintiff's credibility. Dr. Ligouri found that plaintiff's symptoms were out of proportion to the physical findings, and he encouraged her to find a job and return to work.
24. Plaintiff had a dysfunctional family history, both in childhood and as an adult. Plaintiff was married for the fourth time in December 2003. As early as December 10, 2003, plaintiff was reporting marital discord to her primary care physician. Plaintiff and her husband separated in December 2003, a month before the work accident. Plaintiff's fourth husband left permanently and moved out of state in late January 2004. *Page 9 
25. Prior to her injury by accident, plaintiff had borderline personality disorder (BPD). Her borderline personality disorder is demonstrated by her difficulty maintaining personal relationships, such as her many marriages. Plaintiff also tends to have histrionic and overly dramatic behavior, which has been demonstrated in many of her medical and psychological examinations.
26. On March 19, 2004, about two months after the work accident, plaintiff was voluntarily admitted to The Oaks Mental Health Facility for psychiatric treatment. In completing the intake questionnaire, plaintiff checked off almost every listed "problem." She was assessed upon admission with major depression and was hospitalized there for seven days for suicidal ideation. While at The Oaks, plaintiff was under the care of Dr. B. Steven Bentsen, who was not deposed.
27. Dr. Bentsen assessed plaintiff with major depression secondary to chronic pain, with suicidal ideation. His notes also mention mixed personality disorder, her cervical and low back strain, and her recent marital separation. In Dr. Bentsen's initial history and physical notes dated March 19, 2004, he did not diagnose post traumatic stress disorder (PSTD). In his discharge summary of March 26, 2004, post traumatic stress disorder is listed first, although there is nothing mentioned in his narrative regarding this diagnosis. As of her March 26, 2004, discharge, Dr. Bentsen referred plaintiff back to Dr. Rodger and the Center for Pain Management.
28. Plaintiff was again admitted to The Oaks in March 2005 for suicidal ideations. On this admission, she came under the care of psychiatrist Dr. Robert Wilson. She was discharged from The Oaks on March 31, 2005, with orders to seek outpatient care with Dr. Wilson. Plaintiff was also admitted to The Oaks in October 2006 for suicidal ideations. *Page 10 
29. Plaintiff has treated with Dr. Wilson about once a month since 2005 and continues to see him as of the date of his deposition. Dr. Wilson assessed plaintiff with chronic major depression, consistent with her prior assessment at The Oaks in 2004, and post traumatic stress disorder. Dr. Wilson causally related both conditions to her work injury. Dr. Wilson also assessed plaintiff with borderline personality disorder, with a "Cluster B" personality style, which he explained is a mix of borderline histrionics and narcissistic traits. Dr. Wilson testified that plaintiff continuously spoke about her problems with defendant-employer and her concern that "everyone was talking" about her, and that when she tried to enter a Wal-Mart, she had a panic attack.
30. With respect to the diagnosis of post traumatic stress disorder, Dr. Wilson did not provide any detailed or specific information on how he reached this assessment or what criteria he used. The record is also devoid of any expert evidence on how any of plaintiff's prior treating mental health professionals formally arrived at the post traumatic stress disorder diagnosis, as first reflected in the notes from The Oaks of March 2004, and these providers were not deposed.
31. Dr. Wilson is of the opinion that plaintiff's accident at work aggravated her borderline personality disorder and depression and caused her post traumatic stress disorder. In Dr. Wilson's opinion, plaintiff continues to be unable to work due to her psychiatric condition. Dr. Wilson did not believe that plaintiff was malingering or lying about her symptoms. He stated that "when you see marked impairment in occupational, recreational, and social functioning in all areas, particularly within the patient's family, and it persists for the length of time I've seen her, that pretty much rules out malingering."
32. On September 26, October 10, October 22, and November 13, 2007, plaintiff presented for an independent medical examination (IME) with clinical neuropsychologist Christy *Page 11 
L. Jones, Ph.D. at Coastal Neuropsychological Services. Dr. Jones took a detailed social history from plaintiff, evaluated her psychological symptoms in person, and reviewed plaintiff's material prior medical records from her other providers, including Dr. Wilson and the other unauthorized psychological providers. Dr. Jones performed an extensive battery of neuropsychological testing on plaintiff to assess all aspects of general brain function and to assess her psychological diagnoses.
34. According to Dr. Jones, the MMPI-II personality evaluation test resulted in a clear "malingering profile." This assessment is consistent with Dr. Ligouri's perception of plaintiff. Dr. Jones testified that it became readily apparent during testing that plaintiff was attempting to simulate symptoms of post traumatic stress disorder. Plaintiff told Dr. Jones on intake that she did not even know what post traumatic stress disorder was; however, plaintiff had actually studied a printout about post traumatic stress disorder from an Internet website. Dr. Jones reported that plaintiff "actually gave me a lot of her symptoms almost in order of this paper she had studied."
35. In the IME, Dr. Jones opined that plaintiff's report of symptoms is in excess of what one would expect for her injury by accident and that plaintiff does not meet the diagnostic criteria for post traumatic stress disorder or for borderline personality disorder which predated her work accident. Dr. Jones also testified that it was possible that the work accident could have aggravated plaintiff's pre-existing borderline personality disorder. However, Dr. Jones would not expect such aggravation to have lasted long enough to lead to plaintiff's course of post-accident mental health treatment, which did not begin until several months after the accident.
36. In weighing the evidence, the Commission has carefully considered the testimony of all four medical experts who have testified. The greater weight of the evidence shows that *Page 12 
plaintiff was provided all reasonably necessary medical treatment and medications by medical providers authorized by defendant-carrier in a timely manner. The independent unauthorized treatment she sought from Dr. Forstner and Dr. Brown was not reasonably necessary.
37. With regard to plaintiff's psychological condition, the greater weight of the evidence fails to show that she has developed post traumatic stress disorder related to her injury by accident. In this regard, the Commission gives greater weight to the testimony of Dr. Jones than to that of Dr. Wilson. Dr. Jones was the only expert witness to assess plaintiff with detailed neuropsychological testing. Dr. Wilson admitted that he, as a psychiatrist, did not perform such testing. That testing, however, was precisely what allowed Dr. Jones to discover that plaintiff was simulating symptoms of post traumatic stress disorder.
38. Plaintiff had pre-existing borderline personality disorder and depression. Although her primary assessment was borderline personality disorder, Dr. Jones agreed that the diagnosis of depression could also apply, and that plaintiff probably had both since her youth. Although plaintiff had both conditions prior to her injury by accident, the Commission finds that the compensable injury by accident was a significant aggravating factor for plaintiff's depression and borderline personality disorder. Since the accident, plaintiff has manifested histrionic, exaggerated, and sometimes bizarre behaviors. Dr. Wilson's treatment of plaintiff for major depression and borderline personality disorder is causally related to her injury by accident and her chronic pain complaints and was therefore compensable.
39. As the result of the compensable injury by accident and the resulting aggravation of her pre-existing depression and borderline personality disorder, plaintiff is totally disabled from earning any wages in any employment. *Page 13 
40. Based on the Form 60, plaintiff's average weekly wage is $425.30, which yields a compensation rate of $283.54.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On January 5, 2004, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. When a pre-existing, non-disabling, non-job related condition is aggravated or accelerated by a compensable workplace accident, such that disability results, the employer must compensate the employee for the entire resulting disability even though it would not have disabled a normal person to that extent. Morrison v. Burlington Industries,304 N.C. 1, 282 S.E.2d 458 (1981). This is true even where the injury exacerbates a pre-existing psychiatric condition. Toler v. Black Decker, 134 N.C. App. 695, 518 S.E.2d 547 (1999), disc. reviewdenied, 351 N.C. 371, 542 S.E.2d 663 (2000); see also, Calloway v.Memorial Mission Hospital, 137 N.C. App. 480, 528 S.E.2d 397 (2000).
3. As a result of her January 5, 2004 injury by accident, plaintiff sustained a material aggravation of her pre-existing major depression and borderline personality disorder. However, plaintiff did not develop injury-related post traumatic stress disorder. N.C. Gen. Stat. § 97-2
(6); see, Smith-Price v. Charter Pines Behavioral Ctr.,160 N.C. App. 161, 584 S.E.2d 881 (2003).
4. As a result of her January 5, 2004 injury by accident and aggravation of her psychological conditions of borderline personality disorder and major depression, plaintiff *Page 14 
continues to be unable to earn wages in any employment and is totally disabled. She is entitled to ongoing compensation at the rate of $283.54 per week. N.C. Gen. Stat. § 97-29.
5. Generally, defendants have the right to direct medical care once they accept a claim as compensable. This right to direct medical care includes the right to select the treating physician. N.C. Gen. Stat. § 97-25; Schofield v. Tea Co., 299 N.C. 582, 264 S.E.2d 56 (1980);Thompson v. Federal Express Ground, 175 N.C. App. 564, 623 S.E.2d 811
(2006); Kanipe v. Lane Upholstery, 141 N.C. App. 620, 540 S.E.2d 785
(2000). Defendants are not required to pay for treatment provided by an unauthorized physician in an accepted case unless the scenario involves a recognized exception. These exceptions are: 1) lack of prompt medical direction by defendants, 2) an emergency, or 3) Commission approval. N.C. Gen. Stat. § 97-25.
6. The medical treatment rendered by Dr. Forstner and Dr. Brown was not authorized by defendants, was not required under an emergency situation or approved within a reasonable time by the Commission. Dr. Brown's treatment has not been shown to be reasonably necessary, and the medications prescribed by Dr. Forstner were otherwise being managed by an authorized physician. Therefore, the pain medicines prescribed and the treatment rendered by Dr. Forstner and Dr. Brown is not approved as reasonably necessary. N.C. Gen. Stat. § 97-25; Click v. Pilot FreightCarriers, Inc., 300 N.C. 164, 265 S.E.2d 389 (1980).
7. Plaintiff is entitled to payment by defendants for all medical expenses incurred or to be incurred as a result of her January 5, 2004 injury by accident, for so long as such examinations, evaluations and treatments may be reasonably required to effect a cure, give relief or tend to lessen plaintiff's period of disability. The authorized medical care includes but is not limited to treatment of plaintiff's chronic pain, for which pain management is necessary, and of plaintiff's major depression and borderline personality disorder, including treatment at The Oaks *Page 15 
and treatment rendered by Dr. Wilson. The authorized medical treatment does not include treatment for plaintiff's alleged post traumatic stress disorder or medical treatment rendered by Dr. Forstner and Dr. Brown. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall continue to pay plaintiff ongoing total disability compensation at the rate of $283.54 per week through the present and continuing until such time as she returns to work or until further Order of the Commission. This compensation is subject to the attorney's fee awarded below.
2. Defendants shall pay for any past or ongoing treatment for plaintiff's major depression and borderline personality disorder, including treatment at The Oaks and treatment rendered by Dr. Wilson. Defendants are not responsible for any further treatment that may be related to plaintiff's alleged post traumatic stress disorder. To the extent that Dr. Wilson's treatment may have included post traumatic stress disorder and the three conditions cannot be distinguished, defendants shall be responsible for the treatment.
3. Defendants may direct plaintiff's future medical care, to include appropriate pain management and medications, and treatment for her major depression and borderline personality disorder. Plaintiff is ordered to comply with this medical treatment.
4. To the extent that Dr. Wilson is currently treating plaintiff's major depression and borderline personality disorder, such treatment is authorized. No further treatment for the alleged post traumatic stress disorder shall be approved. *Page 16 
5. Defendants shall reimburse plaintiff for verifiable out of pocket expenses which she has incurred for medical treatment with Dr. Wilson and The Oaks Behavior Center related to her compensable psychiatric condition, including but not limited to co-payments, prescription bills and mileage.
6. A reasonable attorney's fee of 25% of the compensation awarded herein is approved for counsel for plaintiff. As no past due compensation is owed, counsel for plaintiff is awarded every future fourth check.
7. Defendants shall pay the costs.
This 30th day of April, 2009.
S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1